**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

GOLDIE A. THORNHILL,

        Plaintiff,

v.                                          Case No.: 3:09-cv-01093

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

        Defendant.

**<u>MEMORANDUM OPINION</u>**

        This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (Docket Nos. 13 and 14).  Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 8 and 9).

        The Court has fully considered the evidence and the arguments of counsel.  For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.**    **<u>Procedural History</u>**

        Plaintiff, Goldie A. Thornhill (hereinafter referred to as "Claimant"), filed for SSI on four separate occasions.  Her first three applications were filed on May 15, 1987, May

22, 2006, and May 4, 2007.  (Tr. at 11).  All three of these applications were denied initially, and the denials were not appealed.  Claimant filed the present application for SSI on October 9, 2007, alleging disability beginning January 1, 1991 due to "back, leg, hip problems, and breathing problems." (Tr. at 11 and 143). The claim was denied initially on December 6, 2007 and upon reconsideration on March 7, 2008. (Tr. at 11). The Claimant then requested a hearing before an Administrative Law Judge, which was held on March 17, 2009 before the Honorable Andrew J. Chwalibog (hereinafter the "ALJ"). (Tr. at 21-38). By decision dated April 15, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-20).

The ALJ's decision became the final decision of the Commissioner on August 27, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). On October 7, 2009, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed his Answer on December 14, 2009 and a Transcript of the Proceedings on the following day. (Docket Nos. 10 and 11). The parties filed their briefs in support of judgment on the pleadings on February 11, 2010 and March 2, 2010. (Docket Nos. 13 and 14).   Therefore, this matter is ripe for resolution.

## II.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d) (5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See *Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a "sequential evaluation" for the

adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* § 416.920(a).

The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 416.920(d). However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity, which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a (c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. *Id.* §416.920a(d)(3).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since October 9, 2007, the date the application was filed. (Tr. at 13, Finding No. 1). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of chronic

pain syndrome and chronic obstructive pulmonary disease ("COPD"). The ALJ considered Claimant's other medically determinable impairments, including carpal tunnel syndrome, headaches, anxiety, and depression, but found none of them to be severe. (Tr. at 13-15, Finding No. 2).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 15-16, Finding No. 3). The ALJ then found that Claimant had the following residual functional capacity (hereinafter referred to as "RFC"):

> [L]imited to light exertional lifting/carrying of no more than twenty pounds maximum occasionally and ten pounds frequently; no climbing of ladders/ropes/scaffolds; no more than occasional climbing of ramps/stairs, stooping, balancing, crouching, and crawling; no more than occasional reaching overhead with the non-dominant left upper extremity; avoidance of concentrated exposure to cold temperature extremes and hazards; avoidance of concentrated exposure to heat, fumes, odors, dusts, gases, and pulmonary irritants.

(Tr. at 16-18, Finding No. 4).

As a result, Claimant could not return to her past relevant employment. (Tr. at 18, Finding No. 5). The ALJ considered that Claimant was fifty years old, which qualifies as "closely approaching advanced age," and that she had a limited education. (Tr. at 19, Finding Nos. 6 and 7). He noted that Claimant's prior work was unskilled; therefore, transferability of skills was not an issue. (*Id.*, Finding No. 8) Nevertheless, based on the evidence of record and the vocational expert's testimony, the ALJ concluded that Claimant could perform jobs such as cleaner, cafe′ attendant, bench work laborer, and assembler, all of which exist in significant numbers in the national and regional economy. (Tr. at 19-20, Finding No. 9). On this basis, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 20).

### III. <u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

A careful review of the record in this case reveals that the decision of the Commissioner is supported by substantial evidence.

## IV.  **Claimant's Background**

Claimant was fifty one (51) years old at the time of the administrative hearing. (Tr. at 25).  She quit school in the eighth grade and never obtained a GED.  (Tr. at 26). Claimant testified that she could add and subtract, but her reading and writing skills were weak.  (*Id.*).  Prior to her alleged disability onset date, Claimant had worked in food preparation and housekeeping.  (Tr. at 144).  She worked on a part-time basis from 2001 until 2003 and quit her last job, because she "couldn't get along with management." (*Id.*).

## V.  **Relevant Medical Records**

Claimant filed her fourth application for benefits on October 9, 2007.  The Court has reviewed all of the Transcript of Proceedings, including the medical records in evidence, but will only comment on those records pertinent to the application at issue. According to Claimant, her alleged disability is the result of musculoskeletal impairments involving her neck, left shoulder, lower back, left leg, and hips, and breathing issues related to COPD.  She also alleges depression and anxiety.

### A.    **Musculoskeletal Impairments and COPD**

In March 2006, Claimant presented to the Emergency Department ("ED") at St. Mary's Medical Center ("SMMC") complaining of pain in her left shoulder.  According to Claimant, she injured her shoulder in 2002 while at work and had developed chronic problems associated with the injury, including constant pain that had recently begun to travel from her shoulder into her arms and hands.  (Tr. at 292).  She reported that the pain made it difficult to hold her grandchildren.  She was diagnosed with left shoulder pain with radiculopathy.  (*Id.*).  Approximately three weeks after this visit, Claimant returned to the ED still complaining of left shoulder pain.  (Tr. at

289).  She indicated that she had some cramping in her neck and shoulder, as well, and was having difficulty moving her arm.  The ED physician ordered an x-ray of Claimant's left shoulder, which was negative.  (Tr. at 291).

On April 21, 2006, Claimant presented to the ED at Cabell Huntington Hospital ("CHH") with symptoms of left wrist pain that had existed for two weeks.  (Tr. at 190). The ED physician noted that there was some tenderness in the wrist, but no evidence of swelling or neurological impairment.  He prescribed a wrist splint and Anaprox DS. (*Id.*).

Claimant returned to the ED at SMMC on May 19, 2006 complaining of chronic left shoulder pain.  A Physician's Assistant ("PA") examined Claimant and noted exquisite tenderness in the upper trapezius and lateral aspect of Claimant's left shoulder.  (Tr. at 287-288).  The PA prescribed Lortab, Naprosyn, and Flexiril.

On July 4, 2006, Claimant again presented to the SMMC ED with similar complaints, although she now reported that the musculoskeletal pain was causing her to have headaches.  (Tr. at 285-286).  The PA examined Claimant and documented that while Claimant had pain and tenderness in her shoulder, she still had a full range of motion.  The PA was concerned about Claimant's lungs, which had crackles and diminished breath sounds.  The PA noted that Claimant had smoked two packs of cigarettes a day for thirty five years.   He urged her to stop smoking immediately. (*Id.*).

On April 16, 2007, Claimant returned to the SMMC ED complaining of pain in her left shoulder and left wrist.  (Tr. at 282-284).  She indicated that the pain was worse with movement, her wrist felt numb, and her hand tingled to the fingers. The examining PA noted pain and tenderness in the area.  The patient was able to exhibit a

full range of motion, with pain, and had a positive Tinel's sign.  Claimant was diagnosed with chronic low shoulder pain and left wrist pain probably carpal tunnel. (*Id.*).

In late August, Claimant once again presented to the ED at SMMC.  She reported that her shoulder and wrist were "acting up again." (Tr. at 278-280).  She complained of tingling in her extremity when she washed dishes and rated her pain as 6 out of 10. Claimant also advised the examining PA that she had no primary care physician and relied on the ED to treat her flare-ups.  The PA noted that Claimant had full extension and flexion.  There were no signs of swelling, bruising or bony abnormalities.  An x-ray of Claimant's shoulder was negative.  (*Id.*).

In October 2007, Claimant was seen three times in the SMMC ED for musculoskeletal complaints. (Tr. at 265-266, 270-272, 275-277).   On the first visit, Claimant complained of left shoulder pain.  The PA documented that Claimant had a good range of motion, no swelling, and grip strength of 5 out of 5 bilaterally.  (Tr. at 265).  On the second visit, the treating physician was more concerned with Claimant's COPD, noting inspiratory and expiratory wheezing, than with her musculoskeletal complaints.  He prescribed Albuterol.  (Tr. at 270-272).  On the third visit, Claimant's complaints related to her lower back.  She advised the examining PA that she had experienced back pain off and on for several years, but had never been evaluated for it. She described the pain as radiating down her right leg.  (Tr. at 265-267).  The PA documented a full ROM, but noted a mildly positive straight leg raising test.  An x-ray of Claimant's lumbar spine revealed early degenerative disc disease, particularly at the L4-5/S1, and atherosclerosis of the abdominal aorta.  (Tr. at 268).  The PA diagnosed

Claimant with radicular back pain and degenerative changes in the lumbar spine.  (Tr. at 267).

Two weeks later, on November 13, 2007, Claimant presented to the ED at SMMC complaining of back pain.  She told the PA that her pain was aggravated by bending, stooping and walking.  (Tr. at 262-264).  Upon examination, the PA found that Claimant had a full range of motion, negative straight leg raising test, strong pulses, and deep tendon reflexes were normal. (*Id.*).  Claimant was in no acute distress and ambulated without difficulty. (*Id.*).

In December 2007 and January 2008, Claimant returned to the ED at SMMC on four more occasions for musculoskeletal pain.  (Tr. at 251-261).  She also complained of concurrent headaches.  The health care providers treated her with several different medications, although Lortab appeared to work the best on Claimant's pain. (*Id.*).  At one point, an examining PA explained to Claimant that the ED was not equipped to treat chronic pain and encouraged her to find a family physician. (*Id.*).

On June 6, 2008, Claimant began treatment at the Ebenezer Outreach.  (Tr. at 363-364).  Her primary medical conditions were listed as COPD, lumbosacral pain with sciatica, and hypothyroidism. (*Id.*).  She told the physician that she was a homemaker, smoked two packs of cigarettes per day, took Aleve for pain, and worked in her garden for exercise. (*Id.*).  Her initial physical examination was scheduled on July 3, 2008.  (Tr. at 370).  On that visit, Claimant described her lower back pain, indicating that it radiated to her knees, down her legs and into her feet.  However, she stated that this pain was "controlled with Ultram." (*Id.*).  She also reported muscle cramps in her left arm and shoulder and indicated that she felt weak and tired all of the time. (*Id.*).

On September 22, 2008, Claimant presented to the Carl Johnson Medical Center. (Tr. at 348).  She was seeking a new physician and needed prescription refills.  She began treating with Dr. Zachary Hansen for hypothyroidism, low back pain, COPD, and restless legs.  (*Id.*). At a follow-up visit in October 2008, Dr. Hansen noted that Claimant was feeling better with Advair and had less shortness of breath and less coughing.  (Tr. at 347).  Dr. Hansen continued treating Claimant for these conditions through 2009.  On April 8, 2009, Dr. Hansen noted that Claimant's back pain was controlled most days.  He prescribed a back brace for her to wear during flare-ups.  He indicated that Claimant's shortness of breath was stable and improved with breathing treatments.  (*Id.*).  Dr. Hansen recorded that Claimant was taking Zoloft for depression and this also was working well.  (*Id.*).

On April 27, 2009, Claimant presented to the ED at SMMC.  She reported that she had tripped and fallen the day before and was experiencing left shoulder, back and leg pain.  (Tr. at 402-403).  X-rays taken of Claimant's lumbar spine, pelvis and shoulder were all negative for fractures.  (Tr. at 405-407).

On May 19, 2009, Claimant consulted with Dr. Panos Ignatiadis, a neurosurgeon, upon a referral from Dr. Doug Henson.  (Tr. at 394-395).  In a letter to Dr. Henson, Dr. Ignatiadis stated that he had examined Claimant for chronic back pain.  He found no neurological deficits; no evidence of disc herniation or stenosis; only a mild degree of degenerative disc disease; and all muscle strengths to be 5 out of 5.  He concluded that Claimant was not a candidate for surgery and recommended chiropractic care or physical therapy "or possibly pain management as a last resort."  (*Id.*).

### B.    Psychological Impairments

Claimant's first consultation for mental health care occurred on June 12, 2008, when she presented to Prestera Center for Mental Health Services ("Prestera").  (Tr. at 308-312).   Claimant provided a psychosocial history to Christin Vickers-Sesco, the case manager assigned to Claimant's care.  (*Id.*)  Claimant told Ms. Vickers-Sesco that she had experienced anxiety and decreased sleep for approximately two years and felt that confrontations with her children were a cause of her problems.  She reported no history of psychiatric care and denied taking any psychotropic medications.  Her only brush with the law involved food stamp fraud.  (*Id.*)  Claimant further advised Ms. Vickers-Sesco that she had no difficulties with activities of daily living and she had the support of family and friends; however, she felt her anxiety and panic were severe. (*Id.*)   Ms. Vickers-Sesco assessed Claimant's prognosis as fair and scheduled an appointment for her with Jamie Stoner, an Advance Practice Registered Nurse at Prestera.

Only July 28, 2008, during her intake interview with Jamie Stoner, Claimant stated that her anxiety and depression started in 1999 after the death of her parents. (Tr. at 327-328).   She had not sought mental health services in the past and denied any issues with substance abuse.  She reported that she was divorced and had two grown children.  Her medical history included COPD, hypothyroidism, and chronic back and shoulder pain.  She took Combivent and Singular for her COPD, thyroid medication, and Ultram for her musculoskeletal pain. (*Id.*)   Claimant was diagnosed with Depressive Disorder, not otherwise specified, rule out Major Depressive Disorder, and Anxiety Disorder, not otherwise specified.   She was given trial prescriptions of Celexa and Vistaril.  (*Id.*)

On November 3, 2008, Claimant was again assessed by Christin Vickers-Sesco. (Tr. at 334-341).  Ms. Vickers-Sesco noted that Claimant was fully oriented and had a normal appearance, but was withdrawn with thought blocking.  (Tr. at 339).  She confirmed that Claimant did not have any functional deficits in activities of daily living.  Ms. Vickers-Sesco diagnosed Claimant with Generalized Anxiety Disorder, giving her a Global Assessment of Functioning score ("GAF") of 56.[1] (Tr. at 340) Claimant was subsequently given a prescription for Zoloft to treat her depression and anxiety.  (Tr. 343).

On January 22, 2009, Nurse Stoner completed a Medical Assessment of Ability to do Work-Related Activities (Mental) in which she evaluated Claimant's abilities to work.  (Tr. at 354-356).  Nurse Stoner generally rated Claimant's abilities as "poor," meaning her ability to function was seriously limited although not precluded.  Nurse Stoner reported that Claimant had memory impairment, panic attacks, decreased concentration, low energy and poor motivation.   (*Id.*).  Three weeks later, Nurse Stoner had a counseling session with Claimant and documented that Claimant was "feeling better." (Tr. at 379).  She indicated that her mood and appetite had improved and she felt less sad.  Claimant did state that she was "worried about [her] upcoming disability hearing. (*Id.*).   Nurse Stoner diagnosed Claimant with Major Depressive Disorder, recurrent, moderate and gave her a GAF score of 65.[2]

---

[1]  The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100.  This rating tool is regularly used by mental health professionals and is recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV.*  A score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning.  On the GAF scale, a higher score indicates a less severe impairment.

[2]  A GAF of 61-70 indicates "some mild symptoms OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM IV.*

On March 27, 2009, Nurse Stoner met again with Claimant, who reported that she had attended "court." (Tr. at 377). She appeared to be in physical discomfort, but related that her mood had improved; she had less anxiety; and she felt more hopeful with increased motivation. Claimant's GAF score remained at 65. (*Id.*).

At the request of Claimant's lawyer, Dr. D.H. Webb, a local psychiatrist who was treating Claimant for chronic pain, wrote a letter on June 30, 2009 summarizing Claimant's condition. (Tr. at 409-410). He indicated that Claimant had initiated services with his office on November 24, 2008 for chronic pain and "bad nerves." Dr. Webb diagnosed Claimant with Major Depressive Disorder, recurrent, moderate; Anxiety Disorder, NOS, rule out Generalized Anxiety Disorder; and Pain Disorder with both physical and psychological components. Since that time, he had provided her with individual psychotherapy sessions and medication management. He prescribed Oxycodone for her pain and Valium for spasms and anxiety. (*Id.*). He assessed her GAF score as 60.

### C.    SSA Evaluations

On July 7, 2006, in connection with one of Claimant's prior applications, Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment. (Tr. at 198-205). He determined that Claimant could occasionally lift 50 pounds; could frequently lift 25 pounds; could sit, stand, and walk, (each) for about 6 hours per day with normal breaks; and had unlimited ability to push and pull. (*Id.*). Dr. Franyutti further noted that Claimant had some postural limitations and should never crawl or climb ladders/ropes/scaffolds. He also opined that she should avoid concentrated exposure to extreme temperatures; fumes, odors, dusts, gases, and poor ventilation;

and hazards such as machinery and heights. (*Id*.). Dr. Franyutti concluded that "claimant is not credible based on MER."

Dr. Franyutti was asked to reassess Claimant on June 6, 2007. (Tr. at 207-214). His reevaluation was largely the same as his initial review, except he decreased Claimant's exertional capacity for lifting and carrying to 20 pounds occasionally and 10 pounds frequently. Dr. Franyutti also modified Claimant's restriction on the ability to crawl, indicating that she could now perform that function occasionally. However, he added a limitation to Claimant's ability to reach in all directions. (*Id*.). Finally, he modified his prior assessment in that he did not feel that Claimant was restricted in her exposure to extreme heat. Dr. Franyutti concluded that Claimant was partially credible and her allegations were partially supported by the findings. (*Id*.).

On November 30, 2007, Dr. Franyutti completed a third Physical Residual Functional Capacity Assessment. (Tr. at 223-230). His findings were essentially the same as they were in June, although he no longer limited Claimant's ability to reach. He reported in this evaluation that he felt Claimant was credible and her allegations were supported by the findings. (*Id*.). This third evaluation was affirmed by Dr. James Egnor on January 30, 2008. (Tr. at 232).

## VI. **Claimant's Challenges to the Commissioner's Decision**

Claimant identifies the following five errors allegedly committed by the ALJ:

1.    He disregarded the effects of Claimant's COPD and chronic pain;

2.    He failed to consider Claimant's pain or perform a credibility analysis.

3.    He failed to consider all of Claimant's impairments in combination.

4.    He failed to develop of the evidence; and

5.    He failed to produce sufficient evidence to rebut the "presumption of disability."

According to Claimant, any one of these errors was sufficiently grave to require a reversal of the Commissioner's decision or a remand for further administrative proceedings.  (Pl. Br. at 6-12).

In response, the Commissioner argues that Claimant's contentions are without merit.  He indicates that the ALJ fully developed the record and carefully considered the evidence; that he performed a credibility assessment; and that he specifically addressed and discussed Claimant's combination of impairments in his decision.  The Commissioner also asserts that Claimant's challenges lack factual support and are nothing more than conclusory statements.  (Def. Br. at 11-17).

Having thoroughly considered the record, the Court agrees with the Commissioner.  The ALJ in this case conducted a comprehensive analysis of the evidence, and his conclusions have substantial evidentiary support.

## VII.      <u>Analysis</u>

While Claimant proficiently recites the governing law, she falls short in demonstrating that the ALJ incorrectly applied that law to the particular facts of the case.   Claimant fundamentally asserts two categories of error.  The first category consists of Claimant's first three allegations against the ALJ and concerns his treatment of the evidence.  The second category includes Claimant's last two criticisms and can best be described as alleged failures of the record.  The Court will consider each category in turn.

### A.     Treatment of the Evidence

The thrust of Claimant's first three arguments is that the ALJ did not give proper consideration to Claimant's contention that her combined physical and psychological conditions substantially impair her ability to function. Claimant points to medical

records that document her shortness of breath, chronic pain, depression and anxiety, maintaining that the "synergistic effect" of these impairments prohibit her from performing basic work activities.

The Court's function is not to re-weigh the evidence; instead, the Court must look at the decision of the Commissioner and determine whether enough evidence exists to support that decision; taking into account that "enough" is "more than a mere scintilla, but may be somewhat less than a preponderance." *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Here, the ALJ indisputably acknowledged the severity of Claimant's COPD and chronic pain, noting that these conditions were well-documented and long-standing in nature. (Tr. at 13). The ALJ likewise thoroughly evaluated the severity of Claimant's other medically determinable impairments and provided an explanation for concluding that they were not severe. For example, he indicated that while the evidence substantiated the possibility of carpal tunnel syndrome, it did not support a finding that Claimant had reduced function in her hands and wrists. He pointed to multiple examinations of Claimant's upper extremities in which she displayed a full range of motion. (Tr. at 14-15). The ALJ similarly discounted the impact of Claimant's headaches, noting that the documented complaints, treatment and findings were minimal. (*Id.*). In regard to Claimant's psychiatric conditions, the ALJ properly applied the special technique in his evaluation of these impairments, confirming that Claimant's ability to perform activities of daily living was generally intact; her social functioning was only mildly limited based upon the descriptions of her interactions with others; her mental status evaluations were consistently normal; and she had no documented episodes of decompensation. (*Id.*). In each case, the ALJ

discussed both the medical evidence and the testimony of the Claimant. His statement of the facts was accurate, and his conclusions were reasonable. Accordingly, the Court finds that the ALJ had substantial evidence upon which to base his severity findings.

Claimant's contention that the ALJ did not consider the combined impact of Claimant's impairments on her ability to function is unpersuasive. The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923 (2002). Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). Contrary to Claimant's conclusory statement, the Court finds that the ALJ adequately considered Claimant's impairments alone and in combination. *See* 20 C.F.R. § 404.1523. The ALJ's RFC finding (Tr. at 16) and the hypothetical questions that he posed to the vocational expert (Tr. at 36-37) provide every indication that the ALJ fully complied with his duty to consider Claimant's impairments and their resulting

limitations in combination.  In his discussion of Claimant's RFC, the ALJ painstakingly detailed Claimant's testimony and compared and contrasted it to the rest of the record. He identified evidence that he felt shed light on the functional impact of Claimant's combined impairments.  (Tr. 16-18).   He noted that Claimant was fully ambulatory, despite her chronic pain, and had made no effort to pursue more aggressive pain reduction treatments, such as physical therapy or pain management with injections, although these modalities had been suggested by her treating physicians.   (*Id.*). Claimant's last MRI revealed only minimal disc disease.  Although Claimant had been advised that weight loss would reduce her symptoms, she had made no effort to diet. Similarly, she had been told to quit smoking to improve her breathing, yet she continued to smoke heavily against medical advice.  Despite smoking, her lung examinations were generally unremarkable and her records reflected good control of her COPD with adherence to prescribed treatment measures.  (*Id.*).

In resolving the discrepancies that existed between Claimant's description of her functional limitations and the picture painted by the rest of the record, the ALJ applied the requisite two-step process in assessing Claimant's credibility.  *Craig v. Chaters*, 76 F.3d 585 (4th Cir. 1996); See also SSR 96-7p.  Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929, to determine their limiting effect on a claimant.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms. SSR 96-7P.  Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, then the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the

claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must make a finding on the credibility of any statements used to support their disabling effect. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in the case record. *Id.*

In this case, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms; thus, the ALJ evaluated the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they prevented her from working. The ALJ found that Claimant's statements concerning the intensity, persistence, and severity of her symptoms were excessive and not credible, because they were inconsistent with other evidence in the record, including descriptions of Claimant's daily activities; her documented non-compliance with physician recommendations for specialized care; references in the record that Claimant "has been very dramatic in her presentation by trying to 'convince' physicians that she is in pain;" her normal range of motion on multiple examinations; the minimal objective findings; the notation in clinic records that Claimant liked to work in the yard, as well as her own statements to mental health care providers that she felt well and her mood and appetite were improved; her lack of motivation to lose weight or stop smoking; and the absence of any evidence that Claimant had suffered a worsening of her condition that would support placing greater restrictions on her physical residual functional capacity.  (Tr. at 16-18).

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulation, case law, and Social Security Rulings and was supported by substantial evidence. 20 C.F.R. § 416.929(b) (2009); SSR 96-7p, 1996 WL 374186 (July 2, 1996); *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Ample evidence existed in the record that Claimant's complaints of pain did not often correlate well with her actions.  For example, Claimant refused to undergo physical therapy to relieve her pain although it had been recommended by her neurosurgeon.  Certainly, if Claimant's pain had been as chronic and debilitating as she described, she would have been willing to try anything to reduce its intensity and persistence. Similarly, Claimant indicated that her breathing difficulties significantly limited her activities, yet the record contains multiple entries in which Claimant denied shortness of breath and generally discounted findings of wheezing and crackles, explaining that these findings were "normal" for her.  She ignored repeated advice to quit smoking; making no effort, even at a minimum, to reduce her cigarette usage.  Claimant's past actions are distinctly at odds with her testimony.  In reaching a conclusion as to the intensity and functional impact of Claimant's impairments, the ALJ appropriately considered these

contradictions in reaching his conclusions about Claimant's credibility.  Therefore, the Court finds substantial evidence supports the ALJ's treatment of the evidence in this case.

### B.   Alleged Failures of the Record

Claimant next contends that the ALJ failed to fully develop the record or rebut "the presumption of disability."  In *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986), the Fourth Circuit Court of Appeals noted that an ALJ has a "responsibility to help develop the evidence."  *Cook v. Heckler*, *supra* at 1173 (4th Cir. 1986).  The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." *Id.*  In *Cook,* the ALJ made a determination that the claimant's arthritis did not meet or equal a listed impairment presumably without having any evidence in the record that was pertinent to the criteria of the listed impairment.   *Id.*  The Court identified some of the medical findings that should have been considered in determining whether or not the claimant met the listed impairment, adding "[w]ithout any of the tests and physician's opinions described above, it is impossible to tell whether Cook meets the requirements in the list of impairments.  It must have been impossible for the ALJ to tell whether she did or did not.  Thus, his failure to ask further questions and to demand the production of further evidence, as permitted by 20 C.F.R. § 404.944, amounted to neglect of his duty to develop the evidence."  The errors of the ALJ in *Cook v. Heckler,* however, were not mirrored in the present case.

While the ALJ in this case had a duty to fully and fairly develop the record, he was not required to act as Claimant's counsel. *Clark v. Shalala,* 28 F.3d 828 (8th Cir.

1994).   The ALJ had the right to assume that Claimant's counsel was presenting Claimant's strongest case for benefits.  *Nichols v. Astrue,* 2009 WL 2512417 *4 (7th Cir. 2009), citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387,391 (7th Cir. 1987). His responsibility was to insure that the record contained sufficient evidence upon which to make an informed decision.  *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); See also, *Weise v. Astrue,* 2009 WL 3248086 (S.D.W.Va.).   When retrospectively reviewing the adequacy of the record, the Court must look for evidentiary gaps that resulted in "unfairness or clear prejudice" to the claimant.  *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).  The Court should remand a case for the failure of an ALJ to adequately develop the record only when these circumstances exist.  *Id.*

In the present case, Claimant identifies no specific evidentiary gaps, nor does the Court find any.  As the Commissioner correctly argues in his brief, "mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand."  *Binson v. Shalala,* 13 F.3d 243, 246 (7t Cir. 1994).  Undoubtedly, a significant evidentiary hole would not remain so successfully hidden or be the subject of supposition.  At this stage of the process, if Claimant is unable to present tangible evidence of prejudice or unfairness, then the Court must conclude that it does not exist. The Court finds, therefore, that Claimant's allegation that the ALJ erred by failing to develop the record is unsupported, conclusory, and entirely without merit.

Moreover, it is Claimant's ultimate responsibility to prove that she is disabled; she bears the burden of providing medical evidence to the Commissioner which establishes the severity of her impairments.  20 C.F.R. §§ 404.1512(a) and 416.912(a). *See Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)

("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  Similarly, Claimant "bears the risk of non-persuasion." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056 (4th Cir. 1976).

At the fourth step of the sequential evaluation used to adjudicate disability claims, the SSA recognizes that when a claimant proves the existence of severe impairments, which prevent the performance of past relevant work, the claimant has established a *prima facie* case of disability.  The burden then shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  20 C.F.R. §§404.1520(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy.  *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 404.1569.  However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform.  *Id.*  For that reason, when a

claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* In those cases, the ALJ must prove the availability of jobs through the expert testimony of a vocational expert. *Id.* As a corollary to this requirement, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant so long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. See *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

In the present case, the ALJ recognized that Claimant's chronic pain syndrome and COPD resulted in a combination of exertional and nonexertional impairments. Therefore, he properly relied upon the testimony of a vocational expert in determining that jobs existed in significant numbers in the national economy that Claimant could perform. (Tr. at 35-37). Claimant makes no argument that the vocational expert was not qualified to render opinions, or that her opinions were based upon incomplete or inaccurate hypothetical questions. Indeed, the vocational expert was present throughout the administrative hearing and had the opportunity to listen to Claimant's descriptions of her medical conditions and their resulting functional limitations. Despite the totality of Claimant's restrictions, the vocational expert found light and sedentary exertional level positions that Claimant could perform. Moreover, the vocational expert verified that her opinions were consistent with the Dictionary of Occupational Titles. (Tr. at 37). In view of these circumstances, the Court finds that the ALJ fulfilled his obligation to obtain expert testimony on the subject of job availability

individualized to the Claimant.  Consequently, the decision of the Commissioner that Claimant was not under a disability is supported by substantial evidence.

## VIII.  **<u>Conclusion</u>**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  February 1, 2011.

Cheryl A.  Eifert
United States Magistrate Judge